# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| CHALLENGER TRANSPORTATION, INC., | |
| Plaintiff, | |
| v. | Civil Action No. TDC-14-3322 |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | |
| Defendant. | |
| CHALLENGER TRANSPORTATION, INC., | |
| Plaintiff, | |
| v. | Civil Action No. TDC-14-3463 |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | |
| Defendant. | |

## MEMORANDUM OPINION

Defendant Washington Metropolitan Area Transit Authority ("WMATA"), the operator of the Metro public transportation system in the Greater Washington, D.C. area, initiated a negotiated procurement through which it selected three contractors to provide paratransit services, the MetroAccess supplemental bus service for passengers with disabilities. Plaintiff Challenger Transportation, Inc. ("Challenger"), a disappointed offeror, has filed two related lawsuits, now consolidated. In the first suit, No. TDC-14-3322, Challenger claims that WMATA violated its procurement procedures and otherwise acted in an arbitrary and capricious manner when it rejected Challenger's proposal. In the second, No. TDC-14-3463, Challenger alleges

that WMATA improperly withheld documents that Challenger requested through the WMATA Public Access to Records Policy ("PARP"). Pending are Challenger's Motions for Summary Judgment on the contract award protest and PARP claims, respectively, and WMATA's corresponding Cross Motions for Summary Judgment. The Court held a hearing on the Motions on November 14, 2017. For the reasons set forth below, Challenger's Motion for Summary Judgment on the contract award protest claim is DENIED, and WMATA's corresponding Cross Motion for Summary Judgment is GRANTED. Challenger's Motion for Summary Judgment on the PARP claims is GRANTED IN PART and DENIED IN PART, and WMATA's corresponding Cross Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I. The MetroAccess Procurement

On June 1, 2012, WMATA issued a request for proposals, RFP No. CQ12169/KAM (the "RFP"), seeking contractor proposals to provide transportation services to persons with disabilities through WMATA's MetroAccess program. The RFP stated that WMATA would award multiple five-year contracts, each with an option for an additional five years. WMATA would award contracts to those offerors whose proposals provided the "best value" to WMATA. Administrative Record ("AR") 000086. Cost was "not expected to be the controlling factor in the selection" of the contract awardees, as WMATA intended to conduct an "integrated assessment of the evaluation criteria," including technical factors such as quality, safety, and business management features, rather than award the contracts based solely on "the lowest overall cost to the Authority." AR 000086–87.

The RFP stated that a Technical Evaluation Team (the "TET") would assign to each proposal numerical scores, ranging from one to ten, for its Operating Plan and Procedures, Program Management, and History of Past Performance. The weighted average of a proposal's three scores had to be above 5.0 for that proposal "to be eligible for award consideration." AR 000090. An average score below 3.0 meant that the proposal failed to meet acceptable standards, contained "uncorrectable" deficiencies, and demonstrated "a lack of understanding of WMATA's requirements or omissions of major areas." AR 000090.

In August 2012, WMATA approved a Source Selection Plan ("SSP") for this procurement, which outlined the manner in which WMATA would choose the contract awardees. The SSP identified Chief Procurement Officer ("CPO") Heather Obora as the procurement's Source Selection Authority and designated the five members of the TET. The SSP also explained that, after the TET had completed its initial evaluation, "communications" could be "held with the offerors in order to address issues that must be explored in order to determine whether or not a proposal should be placed within the competitive range," that is, whether a proposal merited proceeding to the next stage of the procurement process. AR000010.

By the August 17, 2012 deadline, 11 companies had submitted proposals in response to the MetroAccess Service Delivery RFP: Challenger; Diamond Transportation Services, Inc. ("Diamond"); First Transit, Inc. ("First Transit"); Veolia Transportation Services, Inc. ("Veolia"); MV Transportation, Inc. ("MV"); Keolis Transit Services, LLC ("Keolis"); TNT Destination Services ("TNT"); Premier Paratransit, LLC ("Premier"); Ride Right, LLC ("Ride Right"); SCR Medical Transportation, Inc. ("SCR"); and TransCare Maryland, Inc. ("TransCare").

The TET met in October and November 2012 to discuss the proposals.  By November 26, 2012, the TET had completed its initial review of all of the proposals.  Notably, however, most of the technical evaluation forms, to be filled out by each of the five TET members for each of the 11 proposals, were not completed by the end of November 2012.  Only seven of the forms were completed in October or November 2012.  For example, one of the TET members evaluated Challenger's proposal on November 14, 2012 and completed a technical evaluation form for Challenger on that same date.  The remaining technical evaluation forms were completed between December 14, 2012 and January 3, 2013.

Meanwhile, by November 21, 2012, the TET members had submitted more than 200 of what they referred to as "clarification questions" to the contract administrator.  The questions addressed only proposals from six offerors:  Diamond, First Transit, Veolia, MV, Keolis, and SCR.  On November 29, 2012, WMATA sent the clarification questions specific to each individual proposal to each of these offerors.  According to CPO Obora, the TET decided not to send clarification questions to the other five offerors, including Challenger, because based on their average technical evaluation scores of 3.0 or below, their proposals were deemed "unacceptable and uncorrectable."  AR 007651.

First Transit, Diamond, and Veolia, which were the eventual contract awardees, received 50, 25, and 33 questions, respectively.  The questions sought additional information on, or explanation of, a variety of issues arising from each offeror's proposal, ranging from the experience of the offeror's employees to the details of its severe weather response plan.  The six offerors that received clarification questions provided detailed responses by December 7, 2012.  For example, First Transit submitted 58 pages of additional information, Diamond submitted 45 pages, and Veolia provided 167 pages.  The responses included diagrams of parking facilities,

sample safety plans, and detailed descriptions of work processes. The technical evaluation forms for each of these six offerors were completed in December 2012 or January 2013, after the submission of the responses to the clarification questions.

On January 9, 2013, the Chair of the TET prepared a memorandum (the "TET Memorandum") summarizing the TET's assessment of the proposals. According to the TET Memorandum, Challenger received average scores of 2.0 in both the Operating Plan and Procedures and Program Management categories and an average score of 1.6 for the History of Past Performance category, resulting in a weighted average score of 1.9, the second lowest of all offerors. Specifically, the TET Memorandum stated that Challenger's proposal "failed to meet an acceptable evaluation standard" and that:

> The proposal contained significant weaknesses, including: lack of a comprehensive safety program or plan, performance plan does not describe how proposer will meet performance measures, inadequate proposed road supervisor coverage, proposer states [door-to-door] service is only provided when requested—showing lack of understanding of major MetroAccess policy as an incumbent provider, proposal does not indicate how proposer will investigate complaints, lack of a comprehensive severe weather operations plan, and poor history of past performance on current contract, covering all aspects of service (e.g. driver behavior, attainment of performance measures, management practices, adherence to MetroAccess policy and procedure[s,] etc.).

AR 001431–32. According to the TET Memorandum, Challenger, Premier, Ride Right, TNT, and TransCare, all of which received weighted average scores of less than 3.0, "did not meet technical evaluation standards," and the TET did "not recommend proceeding with these proposers." AR 001432. By contrast, Diamond, First Transit, Veolia, MV, Keolis, and SCR all had average scores of 6.0 or above and "met the technical evaluation standards." AR 001432.

After receiving the TET Memorandum, CPO Obora determined that the proposals from Diamond, First Transit, Veolia, Keolis, and SCR were in the competitive range for this

procurement. WMATA then conducted discussions with each offeror in the competitive range before inviting Diamond, First Transit, Veolia, and Keolis to submit their best and final offers.

Meanwhile, although the January 9, 2013 TET Memorandum had recommended removing five proposals from further consideration, Contract Administrator Karen McSween, a recipient of the TET Memorandum, emailed all 11 offerors on February 15, 2013 to ask them to extend the validity of their proposals. Challenger agreed to the extension.

By February 27, 2013, WMATA had decided to award contracts to Veolia (50% service level), First Transit (35% service level), and Diamond (15% service level). Award offers were mailed on March 1, 2013. Notices to unsuccessful offerors were distributed the same day.

Veolia, as Challenger would later discover, was affiliated with Thomas Downs, the Chairman of the WMATA Board of Directors at the time that the contracts were awarded in March 2013. In November 2011, while serving as Vice Chairman of the Board and before the RFP for the MetroAccess procurement was issued, Downs had disclosed that he "serve[d] as the Chairman of the Veolia Transportation North American Board of Business Advisors" and had a "financial relationship with the company." Joint Statement of Facts ("JSF") ¶ 37, ECF No. 97-1; AR 006367–68. In February 2012, Downs again disclosed that he had a "financial interest" in Veolia and at that point recused himself from any WMATA Board discussions or votes regarding the MetroAccess procurement. JSF ¶ 38, ECF No. 97-1; AR006369–70.

After learning that it had not received a contract award, Challenger requested an agency debriefing, which was held on March 21, 2013. At the debriefing, a WMATA official told Challenger that its proposal was deficient in key areas. Five days later, Challenger filed a protest in which it sought to refute the alleged deficiencies. WMATA formally denied Challenger's contract award protest on July 30, 2014. The denial letter, signed by CPO Obora, stated:

Challenger was not selected for award because of numerous, serious deficiencies in its proposal, including: (1) multiple, documented problems with past performance, such as accounts of multiple sexual assaults by drivers on WMATA customers; failure to meet FTA drug testing protocols; failure to timely report accidents; failure to safely operate vehicles; and violations of federal labor law, among other things; (2) failure to provide specific detail in such areas such as safety, maintenance, and fare collection; and (3) deficiencies in Challenger's plan for customer service and quality assurance.

AR 007732. The denial letter also stated, incorrectly, that WMATA had not established a competitive range for the procurement.

## II. PARP Requests

The day after it filed its contract award protest, on March 27, 2013, Challenger submitted a request for documents through PARP, WMATA's Freedom of Information Act analogue. In the request, Challenger sought five categories of records:

1. The Records Retention Schedule of the WMATA Office of Procurement and Materials;

2. All records constituting technical or price proposals—including any supplements, revisions, clarifications or addenda—submitted by entities other than Challenger Transportation, Inc. in response to the RFP;

3. All records related to the Pre-Proposal Conference, including minutes, transcripts, or notes;

4. All records referring to or relating to the evaluation of any proposal submitted in response to the RFP, including:

   a. source selection or evaluation plans,
   b. reviews of offerors' Small Business and Local Preference Program good faith efforts,
   c. evaluation score sheets,
   d. evaluators' notes, including those regarding oral presentation and any meeting of the evaluation or source selection committee,
   e. instructions or handouts to evaluators, and
   f. documents related to reference checks;

5. All records evidencing communications between WMATA and any offeror or potential offeror regarding the RFP, including any evidence of pre-award or post-award negotiations.

7

PARP Joint Statement of Facts ("PARP JSF") ¶ 2, ECF No. 117. The PARP Administrator responded with document releases on August 30, 2013; September 24, 2013; November 15, 2013; December 23, 2013; and February 12, 2014. The releases contained:

- WMATA's Procurement Records Retention Schedule;
- Pre-Proposal Conference records;
- Medical Transportation Management's price and technical proposals;
- Veolia's price and technical proposals;
- Diamond's price and technical proposals;
- MV's price and technical proposals; and
- First Transit's technical proposal.

Medical Transportation Management and MV had received contract awards through this RFP for MetroAccess-related services for which Challenger had not competed. Thus, WMATA released the price and technical proposals for all contract awardees, but not unsuccessful offerors. The disclosed documents contained certain redactions, as WMATA removed individuals' names and contact information to protect their privacy and blacked out certain commercial information, such as the pricing for option years, that WMATA believed could cause competitive harm to the contract awardees should it be released.

Although Challenger's request had sought additional documents, WMATA's PARP Administrator informed Challenger that the remaining materials were exempt from production because they constituted internal agency deliberations or contained proprietary commercial information. On March 20, 2014, Challenger appealed that decision to WMATA's Chief of Staff pursuant to Section 9.1. of the PARP.

In its appeal, Challenger asserted that WMATA failed to respond to its PARP request in a timely manner and argued that it should receive the remaining documents, including First Transit's price proposal, MV's unsuccessful price proposal for the aspect of the RFP for which

Challenger had competed, the RFP's award memorandum, and documents revealing how WMATA evaluated the proposals it had received.

The Appeal Panel issued its ruling on June 27, 2014. The Panel upheld the PARP Administrator's decision in all but one respect: It required the release of First Transit's bottom-line pricing, specifically, the lump-sum price of First Transit's services for the first five years of its contract with WMATA. Noting that the same information for the other contract awardees had already been released to Challenger, the Panel found that releasing this total award amount would not inflict commercial harm on First Transit. The Appeal Panel affirmed the determination that documents relating to the evaluation of proposals, sought in category 4 of Challenger's PARP request, were privileged because they would reveal internal agency deliberations. The Panel also concluded that the unsuccessful offerors' price and technical proposals were not subject to release because they contained confidential commercial information, and their disclosure could harm the public interest by leading to higher procurement costs on future contracts.

## III. Procedural History

On August 27, 2014, Challenger filed a Complaint in the Circuit Court for Montgomery County, Maryland, alleging that WMATA violated its own procurement procedures and acted in an arbitrary and capricious manner when it selected the MetroAccess contract awardees. The Complaint also alleged that awarding the 50 percent service contract to Veolia violated the interstate compact establishing WMATA (the "WMATA Compact") because Chairman Downs had a financial interest in the company at the time that it was awarded the contract. WMATA removed the case to federal court. On December 1, 2014, Challenger filed an Amended Complaint.

On October 2, 2014, Challenger filed a separate Complaint in the Circuit Court for Montgomery County, this time alleging that WMATA had unlawfully withheld records that Challenger had requested through PARP. WMATA removed that case to federal court as well, where it was consolidated with Challenger's first lawsuit.

WMATA filed motions to dismiss both cases, which this Court denied on July 30, 2015. Before discovery, Challenger moved for summary judgment on its contract award protest. The Court denied that motion on January 21, 2016. The parties have now completed discovery. Challenger has moved for summary judgment in both lawsuits, and WMATA has filed corresponding Cross Motions for Summary Judgment.

## DISCUSSION

Challenger and WMATA both seek summary judgment on the contract award protest and the PARP claims. Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motions, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only

"genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

## I.     Contract Award Protest

### A.     Mootness

Before reaching the merits of the contract award protest claim, the Court must first address its jurisdiction. Article III of the Constitution limits the judicial power of the federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "When a case or controversy ceases to exist, the litigation is moot, and the court's subject matter jurisdiction ceases to exist also." *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015). However, a "case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps.*, 567 U.S. 298, 307 (2012)).

WMATA argues that the contract award protest case is now moot because any relief that this Court could grant to Challenger would "serve no practical purpose." WMATA Mem. Supp. Def.'s Cross-Motion Summ. J. at 18, ECF No. 94. Challenger has asked this Court to issue a declaratory judgment that the MetroAccess procurement was unlawful, to void WMATA's March 2013 contract awards to Veolia, First Transit, and Diamond, and to require WMATA to resolicit the contract that Challenger believes it unjustly lost. WMATA argues that this relief is futile because the contract period ends in June 2018, and it has already issued an RFP for the next MetroAccess contract, to begin on July 1, 2018. Proposals in response to that RFP were due in June 2017, and contract awards are expected to be made in late 2017. At this point, WMATA contends, any relief from this Court would be futile because WMATA is already providing Challenger with the opportunity to compete for the *next* MetroAccess contract.

Unlike in *B&B Medical Services, Inc. v. United States*, No. 13-463C, 2014 WL 3587275 (Fed. Cl. June 23, 2014), cited by Challenger, WMATA did not respond to Challenger's protest by re-competing the existing contract. *Id.* at *7. The opportunity to compete for the next contract is not the same relief as potentially receiving an award under the current one. The performance period for the present contract will continue for eight more months. Although WMATA may be hard pressed to resolicit and award a contract of this scope before July 2018, the Court cannot find that no effectual relief is possible. *Cf. Kingdomware Techs. v. United States*, 136 S. Ct. 1969, 1975–76 (2016) (finding in a contract award challenge that when the service period under the contract had ended, there was "no live controversy in the ordinary sense" because "the services have already been rendered," but declining to deny the claim as moot because the issues arising under such short-term contracts were "capable of repetition, yet evading review"). The Court will therefore turn to the merits.

**B.      Legal Standard**

Section 73 of the WMATA Compact addresses WMATA's contracting and purchasing authority. It provides that WMATA must "obtain full and open competition through the use of competitive procedures" when procuring goods and services. WMATA Compact § 73(a)(1)(A), *codified at* Md. Code Ann., Transp. § 10-204(73)(a)(1)(A) (2016). WMATA must adopt contracting and purchasing policies and procedures. *Id.* § 73(g). These policies are contained in WMATA's Procurement Procedures Manual ("PPM"). Section 73 also affords WMATA discretion to "reject any and all bids or proposals received in response to a solicitation." *Id.* § 73(h).

The WMATA Compact grants to federal district courts original jurisdiction over "all actions brought by or against" WMATA. *Id.* § 81. Federal courts have recognized a cause of

action for a disappointed offeror to challenge a WMATA contract award, analogous to a challenge to a federal agency's procurement decision, under a standard comparable to that applied under the Administrative Procedure Act. *Elcon Enters., Inc. v. WMATA*, 977 F.2d 1472, 1478–80 (D.C. Cir. 1992); *Monument Realty LLC v. WMATA*, 535 F. Supp. 2d 60, 73–74 (D.D.C. 2008); *Seal & Co., Inc. v. WMATA*, 768 F. Supp. 1150, 1157 (E.D. Va. 1991). In order for a plaintiff to succeed on such a challenge, two prongs must be satisfied. First, the court must find that the agency violated applicable procurement law or procedure or otherwise acted without a rational basis. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Second, it must conclude that the agency's action caused significant prejudice to the offeror. *Bannum*, 404 F.3d at 1351, 1353; *Monument Realty LLC v. WMATA* (*Monument Realty II*), 540 F. Supp. 2d 66, 77 (D.D.C. 2008).

### C.     Clarification Questions

Challenger first argues that WMATA violated its procurement procedures when it allowed six companies to revise their proposals by answering "clarification questions," but did not extend that opportunity to Challenger. Specifically, Challenger claims that the exchanges with the six companies constituted "discussions" that, under federal procurement law and the PPM, were improper because they were held with only some, but not all, of the offerors. Challenger further argues that the clarification questions unfairly favored some offerors over others in violation of WMATA's PPM because, as extensive as these exchanges were, they allowed favored offerors to make material revisions to their proposals before a competitive range was set.

In negotiated procurements such as the MetroAccess RFP, the contracting officer establishes a "competitive range," that is, a list of proposals "that have a reasonable chance of being selected for award." PPM § 618.2 (2004). The contracting officer may then engage in "discussions" with each of the offerors whose proposals were placed in the competitive range. *Id.* §§ 618.1, 619.1. Discussions are oral or written communications, including negotiations, about "information essential for determining the acceptability of the proposal or to cure identified defects in the proposal." SSP at 6, AR 00006. During discussions, the contracting officer may identify deficiencies, mistakes, and uncertainties in the proposal and allow the offeror the opportunity to resolve them. PPM § 619.4. The contracting officer also allows the offeror to explain past performance information received from references and to submit any cost, technical, or other revisions to the proposal. *Id.*

Discussions give offerors the opportunity to modify their proposals to tailor them to the government's needs. Therefore, WMATA's 2004 PPM, like federal procurement law in general, requires "that, if discussions are held with any offeror within the competitive range, discussions are held with all offerors in the competitive range." PPM § 619.2. The purpose of this restriction is "to prevent a bidder from gaining an unfair advantage over its competitors by making its bid more favorable to the government in a context where the other bidders have no opportunity to do so." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1320 (Fed. Cir. 2003) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1561 (Fed. Cir. 1996)) (discussing provisions in federal procurement statutes similar to PPM § 619.2).

WMATA's 2004 PPM distinguished between "discussions," which occur only after the contracting officer has established the competitive range, and "communications conducted for the purpose of minor clarifications," which can occur at any time. *See* PPM § 619.1(b). There is

no restriction in the PPM that requires contracting officers to conduct these "communications" with all offerors. The terms "clarifications" and "communications" have distinct meanings in federal procurement law. "Clarifications" are defined in the Federal Acquisition Regulation ("FAR") as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." 48 C.F.R. § 15.306(a)(1). Clarifications give offerors "the opportunity to clarify certain aspects of proposals" or "to resolve minor or clerical errors." *Id.* § 15.306(a)(2). Separately, the FAR defines "communications" as "exchanges, between the Government and offerors, after receipt of proposals, leading to establishment of the competitive range." *Id.* § 15.306(b). Communications may "be conducted to enhance Government understanding of proposals; allow reasonable interpretation of the proposal; or facilitate the Government's evaluation process." *Id.* § 15.306(b)(2). Through communications, the government can address issues that must be considered when determining whether a proposal should be placed in the competitive range, such as ambiguities, "perceived deficiencies, weaknesses, errors, omissions, or mistakes," as well as past performance issues. *Id.* § 15.306(c)(i). Communications may not, however, be used to "cure proposal deficiencies or material omissions" or to "materially alter the technical or cost elements of the proposal" or "otherwise revise the proposal." *Id.* § 15.306(b)(2). Communications may be held only with offerors "whose exclusion from, or inclusion in, the competitive range is uncertain" or "whose past performance information is the determining factor preventing them from being placed within the competitive range." *Id.* § 15.306(b)(1).[1]

---

[1] The distinction between "communications" and "clarifications," as tools used in WMATA's procurement process, was clarified in WMATA's 2017 PPM. The 2017 PPM closely tracks the FAR, describing "clarifications" as "limited exchanges" used to "clarify certain aspects of proposals or to resolve minor or clerical errors" when the government does not intend to hold discussions. PPM § 10-19(a) (2017). "Communications," on the other hand, are "exchanges

The August 2012 SSP for the MetroAccess procurement appears to allow for both "clarifications" and "communications." The SSP states that WMATA "may request clarifications during evaluation of the proposals regarding any of the points addressed in the proposal which are unclear and may ask for elaboration by the offeror of any point that was not adequately supported in the proposal." SSP § 7.1, AR 000010. The SSP defines "clarifications" as communications with an offeror "for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal." *Id.* § 6.1, AR 000006. Unlike discussions, "clarifications do not give the offeror an opportunity to revise or modify its proposal, except to the extent that correction of [an] apparent clerical mistake results in revisions." *Id*. This definition is repeated in the MetroAccess RFP. AR 000091.

The SSP also authorizes "communications." Specifically, it provides that "[a]fter initial technical evaluations are completed 'communications' (similar to fact-finding) may be held with the offerors in order to address issues that must be explored in order to determine whether or not a proposal should be placed within the competitive range." SSP § 7.1, AR 000010. The term "communications" is not separately defined in the SSP.

Considered in the context of this guidance, the "clarification questions" posed by WMATA to six offerors on November 29, 2012 generally appear to constitute a combination of "clarifications" and the broader category of "communications." Significantly, the parties agree that the competitive range for the MetroAccess procurement was not set until after January 9, 2013. Thus, the questions sent on November 29, 2012 generally qualify as "communications"

---

between Contracting Officers and proposers" that occur "during the proposal evaluation process" but "prior to the proposals being scored by the TET." *Id.* § 10-19(b). Communications may "clarify the Authority's understanding of the proposal, clarify past performance issues for responsibility determinations, or facilitate the proposal evaluation process." *Id.* Still, communications "must not be used to cure deficiencies, omissions, technical or cost elements of the proposal." *Id*. § 10-19(c).

consisting of "exchanges, between the Government and offerors, after receipt of proposals, leading to establishment of the competitive range," 48 C.F.R. § 15.306(b); *see also* SSP § 7.1, AR 000010, not "discussions," which are held with offerors already placed in the competitive range, *see* PPM §§ 618.1, 619.1. Indeed, it is evident that WMATA used the responses to its questions, which it received in December 2012, in its January 2013 determination of the competitive range. There is no requirement that such communications must be held with all offerors.

"Communications," however, are limited in that although they may result in the submission of clarifying information or additional detail about a proposal, they may not provide an opportunity for an offeror to modify or revise its proposal. 48 C.F.R. § 15.306(b). Only discussions may allow for such changes. *Id.*; SSP § 7.3, AR 000010. Federal courts' interpretation of analogous federal procurement law is instructive here. To decide whether conversations between the government and offerors constitute "discussions" under the FAR, courts ask "whether it can be said that an offeror was provided the opportunity to revise or modify its proposal." *Rivada Mercury, LLC v. United States*, 131 Fed. Cl. 663, 679 (2017) (quoting *Davis Boat Works, Inc. v. United States*, 111 Fed. Cl. 342, 353 (2013)). Indeed, unlike clarifications or communications, discussions "are undertaken with the intent of allowing the offeror to revise its proposal." 48 C.F.R. § 15.306(d); *see also Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 534 (2013) (describing the purpose of discussions). Although it is "[t]he actions of the parties, not the characterization by the agency, [that] determine whether discussions have been held," *Allied Tech. Grp., Inc. v. Unites States*, 94 Fed. Cl. 16, 44 (2010), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011), "the agency's characterization of an exchange as a clarification is entitled to deference from the court," *Mil-Mar Century Corp.*, 111 Fed. Cl. at 535.

Here, WMATA contemporaneously and consistently described its pre-competitive range exchanges with offerors as "clarification questions," not "discussions." Consistent with that self-designation, a review of the questions reveals that many seek clarification or explanation of the proposals' existing terms. Among the questions to Veolia, for example, are requests to "[p]lease elaborate on your plan to provide tablet computers to taxi providers," and "[p]lease explain how the ratio of drivers to trips was determined." AR 006697.

Other questions appear to seek additional details and information, such as:

- How many Street Supervisors are proposed?

- Please describe your safety plan for MetroAccess service.

- Please provide [a Continuity of Operations Plan] and Facility Safety and Emergency Preparedness plans.

- Please detail your process to investigate, manage and resolve complaints.

- The response lacks detail. Please provide a detailed plan for how Veolia will plan for, operate in, and recover from the types of severe weather that can be expected in the DC metropolitan area.

- Please address the RFP requirements regarding this interaction [with a separate Quality Control contractor].

AR 006697–98.

A review of Veolia's original proposal reveals that these questions address material that Veolia had already included in its proposal. The question about street supervisors sought clarification about a graph. Where Veolia's original proposal had already included 15 pages describing its safety programs, with additional material in an appendix, WMATA's clarification question simply sought the safety plans themselves. Likewise, because Veolia had already included a description of a severe weather safety plan in its proposal, WMATA's clarification question again sought to see the plan itself, rather than the summary description. Given that

Veolia's original proposal included one paragraph about its complaint review process, WMATA's question about that process just sought more details. And where Veolia had provided half a page about its planned interaction with a quality control contractor, WMATA's clarification question sought more details about this service that Veolia had already committed to provide.

Veolia responded to WMATA's 33 clarification questions with 167 pages of material. While voluminous, the information submitted did not materially change the terms of Veolia's proposal and offered the same services that Veolia had already agreed to provide. *See Rivada Mercury*, 131 Fed. Cl. at 679–80 (noting that exchanges between the government and offerors do not become "discussions" simply because they are extensive). For example, Veolia's answer about street supervisors clarified the graph in the proposal and provided some estimates on how many street supervisors would be needed depending on the size of the service area and the required response time. The safety plans requested consisted of sample Emergency Preparedness, Workplace Safety, and Emergency Action Plans, the broad outlines of which Veolia had already described in its proposal. Veolia stated that it would not develop MetroAccess-specific versions of these plans unless it received the contract. Veolia's responses about its complaint review process and interactions with a quality control contractor similarly do no more than provide additional details about services that Veolia had already committed to provide.

A review of the other proposals, WMATA's clarification questions, and the offerors' responses produces largely similar results. In most cases, WMATA did no more than seek more detail about provisions that were already included in the proposals. Because the questions were posed as "clarifications" by WMATA, they were submitted after the TET had completed its

initial review of all 11 proposals, they were issued before the designation of the competitive range, and they sought elaboration and additional detail rather than proposal revisions, the Court concludes that WMATA's clarification questions were primarily communications designed to help determine whether a proposal should be placed in the competitive range, not discussions seeking modifications.

A handful of responses, however, come closer to providing modifications to a proposal. For example, WMATA asked First Transit to "[p]lease describe the processes and/or procedures in place to ensure that you will meet or exceed the performance goals stated in the RFP." AR 006869. In response, First Transit described a "daily scoring system" for its drivers, with consequences for drivers with low scores, which does not appear in its original proposal. AR 006911–12. WMATA also asked First Transit to "detail your process to investigate, manage and resolve complaints." AR 006869. First Transit again provided a plan, called a "Complaint Resolution Process," not previously referenced in its proposal. AR 006913–14. Finally, WMATA asked MV, which ultimately did not receive a service-delivery contract award, to "provide an alternate document archiving system" in case the separate Quality Assurance contract did not include scanning and indexing of documents. AR 006854. MV's response offered the same archiving system as in its original proposal but provided a higher cost estimate to reflect the additional services.

In these responses, First Transit and MV described new processes or costs not included in their original proposals that made their offers more appealing to WMATA such that they arguably could be construed as revisions. Notably, the underlying questions did not necessarily relate directly to a service or program already described in the original proposal, and they did not instruct the offerors that their responses could not modify their proposals. *See Mil-Mar Century*

*Corp.*, 111 Fed. Cl. at 535 (considering the inclusion of an instruction not to modify the proposal as a factor in assessing whether an exchange constituted discussions).

At the same time, the exchanges did not bear all the indicia of discussions. WMATA framed the questions as "clarification questions." *See Info. Tech.*, 316 F.3d at 1323 (giving deference to an agency's interpretation of its question as "clarifications"). Discussions are characterized by "negotiations" and "bargaining," which may include "persuasion, alteration of assumptions and positions, [and] give-and-take," and are "undertaken with the intent of allowing the offeror to revise its proposal." 48 C.F.R. § 15.306(d). WMATA's clarification questions did not exhibit the intent to persuade the offeror to modify or alter its proposal. *See Park Tower Mgmt., Ltd. v. United States*, 67 Fed. Cl. 548, 564 (2005); *see also Dyncorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 542 (2007) (resolving "close questions" about whether a question constituted a clarification rather than a discussion in favor of the government if it was "intended as a clarification, was labeled as such, did not clearly violate the limitations on clarifications," and "did not clearly stray into the forbidden zone of discussions"). The fact that the responses provided additional information, even information essential for evaluation of the proposal, does not necessarily mean that they constitute discussions. *See Info. Tech.*, 316 F.3d at 1323 ("Any meaningful clarification would require the provision of information."). A lawful clarification may even include pricing information that was not in the original proposal, so long as it does not change the "total price" or alter the "terms of [the] proposal to make it more appealing to the government." *Mil-Mar Century Corp.*, 111 Fed. Cl. at 535–36, 539 (quoting *Info Tech.*, 316 F.3d at 1322). Ultimately, the Court need not decide whether this limited number of responses constituted discussions that violated WMATA's procurement policies, because it concludes that, even if they did, Challenger did not suffer substantial prejudice as a result. *See infra* part I.F.

### D. Conflict of Interest

Challenger next argues that WMATA violated its Compact and procedures when it awarded a contract to Veolia because a member of the WMATA Board of Directors, Thomas Downs, had a direct financial interest in Veolia at the time of the award. Challenger originally argued in its briefing that this conflict of interest irretrievably tainted the procurement, and that the proper remedy is for this Court to void Veolia's contract award automatically, without requiring evidence of prejudice. At the hearing, however, Challenger's counsel clarified that Challenger no longer seeks voidance of Veolia's contract on this basis. Rather, for this purported violation, Challenger seeks only a declaratory judgment that the contract is unlawful.

Section 10(a) of the WMATA Compact forbids directors, officers, or employees to "be financially interested, either directly or indirectly, in any contract, sale, purchase, lease or transfer of real or personal property" to which "the Authority is a party." WMATA Compact § 10(a); Md. Code Ann., Transp. § 10-204(10)(a). This requirement is repeated in PPM § 210.1 (2004), and a substantially similar provision, applicable only to directors, appears in Article III(B) of the Code of Ethics for Members of the WMATA Board of Directors ("Code of Ethics"). Relatedly, Article III(C) of the 2011 Code of Ethics for Members of the WMATA Board of Directors ("Code of Ethics"), in effect during the relevant time period, provides that "No Board Member may . . . have a Direct Financial Interest in a Party with an Actual or Prospective Business Relationship with the Authority." Code of Ethics art. III(C), AR 006512.

Thomas Downs served as a member of the WMATA Board of Directors from January 2011 until March 2015, including as Chairman at the time of the MetroAccess contract awards in March 2013. From November 2011 to February 2015, a period which includes when Veolia was under consideration for the MetroAccess contract, Downs also served on Veolia's North

American Board of Business Advisors. In November 2011, before the RFP for the MetroAccess procurement was released, Downs filed a Notification of Recusal with the Board, identifying his financial relationship with Veolia, removing himself from the distribution list for material on the MetroAccess procurement, and recusing himself from Board meetings when the MetroAccess procurement was discussed. Nothing in the record indicates that he participated in the MetroAccess procurement in any manner or that he received information about it through his position as a WMATA Board member. According to Downs, "any time MetroAccess business appeared on the Board's meeting agenda, I stated that I had recused myself from the matter and left the meeting for the duration of the discussion on the matter." AR 006366. The WMATA Board had no approval authority over the MetroAccess RFP or any of the MetroAccess contracts.

Challenger argues that Downs's relationship with Veolia violated Section 10(a) of the WMATA Compact. In response, WMATA argues that Section 10(a) applies only to transactions involving real or personal property, not to contracts for services such as the transportation services covered by the MetroAccess procurement. The Court agrees with WMATA. Section 10(a) forbids any "Director, officer or employee" of WMATA from having a financial interest "in any contract, sale, purchase, lease or transfer of real or personal property." Challenger would read "contract" alone, unmodified by "real or personal property." Under that interpretation, however, "sale" and "purchase" would be equally unmodified. The bar on a financial interest in a "sale" or "purchase" makes sense only when those terms are modified to refer to a "sale" of "real or personal property" or to a "purchase" of "real or personal property." Thus, the plain language of the Compact reveals that the restriction on financial interest applies to contracts relating to "real or personal property."

Moreover, Challenger's reading of the provision would render the restriction so sweeping that it could not be a fair interpretation. All WMATA employees would have to avoid any financial interest, such as ownership of a single share of stock, in any company from which WMATA might have any kind of service contract, and WMATA would be barred from contracting with any such company. The list of forbidden contractors would be so long and in such constant flux that WMATA's procurement process would be unworkable. Challenger's reading thus runs afoul of the requirement that interpretations of Maryland statutes not be "unreasonable, illogical, or inconsistent with common sense." *Stoddard v. State*, 911 A.2d 1245, 1250 (Md. 2006) (quoting *Blake v. State*, 909 A.2d 1020, 1026 (Md. 2006)). The Court therefore concludes that Section 10(a) is limited to barring financial interests in contracts or transactions involving real or personal property. It thus does not apply to the MetroAccess procurement.

The Code of Ethics, however, does apply. Article III(C) of the Code of Ethics broadly forbids a WMATA Director from having "a Direct Financial Interest in a Party with an Actual or Prospective Business Relationship with the Authority." Code of Ethics art. III(C), AR 006512. "Direct Financial Interest" is defined as an ownership interest of three percent or more of the total equity of a Party, which includes any "corporation, partnership or other legal entity." Code of Ethics art. II(D), (L). "Actual or Prospective Business Relationship" includes an arrangement through which a corporation or other legal entity has offered or proposed to enter into a transaction obligating WMATA to obtain services. *Id.* art II(A). This prohibition plainly bars a Director from having such an ownership interest in one of the contract awardees in the MetroAccess procurement.

Although this prohibition is written in absolute terms, the Code of Ethics also has a recusal process, under which a Board member "shall not participate in a WMATA Financial

Transaction" if the Board member "has a Direct or Indirect Financial Interest in a Party or prospective Party to that Financial Transaction." *Id.* art. III(D). "Participate" is defined as to "vote, address, discuss or otherwise attempt to influence" a Board decision. *Id.* art. II(K). This recusal provision would be of no relevance should Article III(C) be read as an absolute bar on any Board member having such a financial interest. When interpreting provisions of a statute, the Court presumes that the drafters intended for the "'enactments to operate together as a consistent and harmonious body of law,' so that 'no part of the statute is rendered meaningless or nugatory.'" *Bank of America v. State*, 839 A.2d 727, 733 (Md. 2003) (quoting *Toler v. Motor Vehicle Admin.*, 817 A.2d 229 (Md. 2003)). This principle should apply equally to the exercise of interpreting the Code of Ethics. As the recusal process would never be used if Article III(C) were deemed to be an absolute ban, the Court reads the adjacent provisions in harmony by interpreting the Article III(D) recusal process as curing a violation of Article III(C). Indeed, this is the very reading that was explicitly adopted in 2016 in the Board's updated Code of Ethics. *See* WMATA Code of Ethics art. V (2016) ("Board Members shall resolve Actual Conflicts of Interest via recusal."), https://www.wmata.com/about/board/upload/Code-of-Ethics-Approved-2016-11-17.pdf.

Downs complied fully with the recusal process so that he was shielded from actually influencing or participating in the MetroAccess procurement in any way. Challenger has made no argument to the contrary. The Court therefore concludes that WMATA and Downs did not violate the Compact or the Code of Ethics by considering Veolia in the MetroAccess procurement and awarding a contract to that company.

### E.    Arbitrary and Capricious

Next, Challenger argues that WMATA's decision to deny it a MetroAccess contract lacked a rational basis.  Specifically, Challenger asserts that WMATA acted in an arbitrary and capricious manner by giving extremely low technical scores to Challenger's proposal, as reflected in the TET Memorandum, and in thus failing to give Challenger the opportunity to clarify the perceived weaknesses in its proposal.

In a contract award protest, an agency's action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)).  When analyzing an agency action under the arbitrary-and-capricious standard, courts must sustain the decision if it has a rational basis.  *Mil-Mar Century Corp.*, 111 Fed. Cl. at 522.  This is a "highly deferential" standard, *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000), which "recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking,'" *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 710 (2011) (quoting *Balt. Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 105 (1983)).

When the challenged agency action is a procurement, courts ask whether the agency "provided a coherent and reasonable explanation of its exercise of discretion."  *Impresa*, 238 F.3d at 1332–33 (quoting *Latecoere Int'l., Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Protesters can succeed under this standard by showing that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Protesters, however, carry an "especially heavy" burden when challenging "negotiated, best value procurements," like the one at issue here, because contracting officers are afforded extensive discretion when making those awards. *L-3 Comms. EO Tech, Inc. v. United States*, 83 Fed. Cl. 643, 650 (2008). Specifically, courts are "particularly deferential to the agency's technical evaluation," *Mil-Mar Century Corp.*, 111 Fed. Cl. at 523, because "technical ratings" involve "discretionary determinations" that "a court will not second guess," *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). *See also Compubahn, Inc. v. United States*, 33 Fed. Cl. 677, 682–83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.").

The TET Memorandum recommended that Challenger's proposal be removed from further consideration because of seven identified weaknesses. Challenger argues that the TET lacked a rational basis to assign low scores to these aspects of its proposal, especially when compared to the proposals submitted by other offerors, and that it should have asked Challenger clarifying questions to address those weaknesses. The Court discusses each of these identified weaknesses in turn.

First, the TET Memorandum found that Challenger's proposal lacked a "comprehensive safety program or plan." AR 001431. Challenger objects to this assessment, arguing that Veolia, First Transit, and Diamond were asked to provide additional details about their safety

plans, with Veolia attaching dozens of pages of sample safety plans in response to the clarification questions, yet Challenger was not given a similar opportunity to do so. Challenger states that, had it been allowed to provide more detail about its safety plans, it would not have been given such a low evaluation. Challenger's proposal, however, devoted only eight pages to its safety plans, with very little information addressing customer safety or safety procedures for vehicles on the road, focusing instead on safety in Challenger offices, including the need for ergonomic furniture and safe configuration of cubicles. The TET's individual evaluation sheets describe this submission as "very light," noted that it "seemed to focus mostly on furniture," and found that it was not "comprehensive." AR 001438, 001441. Indeed, Challenger's submission was unimpressive even in comparison to the original proposals offered by the eventual awardees. Veolia's original proposal devoted 16 pages to its safety programs, described multiple safety measures, and included both its Safety Manual and a sample Safety, Security, and Emergency Preparedness Plan as appendices. First Transit's original proposal included 10 pages describing its various safety programs and procedures and attached its entire Safety and Security Manual, which is almost 90 pages long. Diamond originally included 15 pages detailing its safety policies and procedures, including those relating to safety and health training, accident investigations, fatigue management, the safety and security of vehicles, the responsibilities of the safety manager, and descriptions of its continuity of operations ("COOP") procedures. Upon review of these submissions, the Court concludes that even before Veolia, First Transit, and Diamond answered clarification questions, they had provided significantly more information about proposed safety procedures than Challenger had submitted. It was therefore rational for WMATA to conclude that Challenger's proposal had not offered a comprehensive safety program.

Second, WMATA concluded that Challenger's "performance plan does not describe how [it] will meet performance measures." AR 001431. Rather than offer a basis to conclude that it had provided sufficient information on this issue, Challenger again complains that WMATA sought clarification about First Transit's and Diamond's performance plans, but made no similar inquiries to Challenger. Challenger "submits that a reasonable person would not find a material discrepancy" between the deficiencies in Challenger's proposal and those in the initial submissions by First Transit and Diamond. Challenger Mem. Supp. Pl.'s Mot. Summ. J. at 32, ECF No. 96.

Challenger's proposal, however, consisted of promises to meet performance goals, without descriptions of how those commitments would be met. As one TET member stated, Challenger "provided little discussion of how their processes contribute to meeting performance goals. They generally provided 'statements of intent' to comply, but no real information of steps they will take to meet goals." AR 001438. WMATA therefore had a rational basis to conclude that Challenger's proposal deserved low technical scores on this point. Although First Transit's submission was limited on this point as well, Diamond, in contrast, described in its original proposals the processes it would use to ensure that performance goals were met, including procedures for tracking on-time performance, staff coverage of assigned driving runs, complaint resolution, and accident reporting.

Third, Challenger disputes the TET Memorandum's conclusion that it proposed "inadequate . . . road supervisor coverage." AR 001431. Challenger argues that First Transit and Veolia also proposed an inadequate number of road supervisors at first, but that they were allowed to modify their proposals by responding to clarification questions. In fact, First Transit offered six road supervisors in its initial proposal and again in its response to the clarification

questions. Veolia's proposal stated the ratio of drivers to road supervisors that it would provide, which varied from about 1 supervisor for every 10 drivers, to 1 supervisor for every 35 drivers. Challenger, on the other hand, proposed only two road supervisors. WMATA thus had a rational basis to assess Challenger's proposal on this point to be unsatisfactory without additional clarification.

Fourth, Challenger objects to the TET Memorandum's conclusion that its proposal stated that door-to-door service "is only provided when requested," which shows a "lack of understanding of major MetroAccess policy as an incumbent provider." AR 001431–32. Challenger argues that the TET misread its proposal. Challenger offered two forms of door-to-door service. First, if the customer requested assistance, a Challenger driver would assist with opening the vehicle door, getting out of the vehicle, and opening the exterior door of the customer's building. Should the customer not request assistance, the driver "follows the client from the vehicle to the door of the building." The RFP states that "[d]oor-to-door service means that MetroAccess drivers escort customers from the outermost exterior door of the customer's pick-up address and onto the vehicle, and from the vehicle to the outermost exterior door of the customer's drop-off address." AR 000339. This language is ambiguous as to whether "door-to-door service" requires the driver to assist the customer in and out of the vehicle, or whether this requirement may be satisfied if the driver simply walks with the customer to the door. Although Challenger is correct that its proposal arguably satisfied this requirement, it was rational for an evaluator to consider Challenger's requirement that the customer ask for assistance before the driver would open the door and help the passenger out as a lesser form of service. Moreover, unlike Challenger's other areas of deficiencies, this critique was mentioned by only one of the

five evaluators.  The Court therefore concludes that the TET's determination that Challenger did not provide door-to-door service except upon request was not arbitrary and capricious.

Fifth, Challenger objects to the TET's determination that its proposal "does not indicate how proposer will investigate complaints."  AR 001432.  Challenger argues that this deficiency applies equally to Veolia, First Transit, and Diamond, such that it was not rational for the TET to give Challenger a low score on this factor while giving other offerors the opportunity to submit additional information in response to clarification questions.  Challenger's proposal, however, stated only that it "is committed to responding timely to all complaints and to taking appropriate action within the required timeframe to ameliorate the cause of those complaints."  AR 001682. It described no process for how it would do so.  In contrast, Veolia and Diamond described parts of a complaint response procedure in their original proposals.  Both committed to responding to complaints within two days:  Veolia stated that it would cross-train safety and training managers to address complaints, and Diamond pledged to undertake "a route [sic] cause analysis" upon an increase in complaints.  Although the provided descriptions were limited—thus explaining WMATA's requests for further details—the descriptions were more substantial than what Challenger had provided.  As for First Transit, Challenger is correct that First Transit also did not address its complaint response process.  First Transit's inadequacy, however, does not change the suitability of the low score that that the TET gave to Challenger.  To succeed on its arbitrary-and-capricious claim on this issue, Challenger must show that the TET did not have a rational basis to give a low score to Challenger's plainly deficient complaint process.  Challenger has failed to do so.

Sixth, Challenger questions the TET's finding that its proposal lacked "a comprehensive severe weather operations plan."  AR 001432.  Challenger argues that Veolia, First Transit, and

Diamond also lacked comprehensive severe weather operations plans such that the TET lacked a rational basis to conclude that Challenger's proposal was deficient and did not merit clarification questions. Challenger, however, offered only a cursory description of a severe weather plan, the vast majority of which consisted of generic descriptions of common sense steps that any individual should follow to stay safe during a tornado, hurricane, winter storm, or flash flood. Veolia's original proposal did not include a complete severe weather operations plan, but it described the various components that Veolia's Continuity of Operations Plan would have in a manner that reflected the complexities of maintaining transit services during unusual weather events. Among the components referenced were organizational structure and lines of authority when key managers are not present, a vulnerability assessment for each facility for each type of severe weather, and preparedness plans for each type of severe weather event. Diamond's original proposal outlined its response plan, which varied based on the severity of the weather at issue and consisted of three phases: Alert Phase, Operations Phase, and Recovery Phase. Diamond also included a draft manual on Inclement Weather Operational Procedures as an attachment. First Transit provided a limited inclement weather plan but also highlighted its emergency preparedness response capabilities and extensive experience responding to severe weather events in other metropolitan areas. Where Challenger's severe weather response plan was plainly deficient, it has not demonstrated that WMATA lacked a rational basis to conclude that Challenger's plan merited a low score even as compared to the original proposals of the eventual awardees.

Finally, Challenger disputes the finding that as an incumbent provider, Challenger had a "poor history of past performance" on its current contract. AR 001432. In contesting the TET's evaluation of its past performance, Challenger argues that its recent On-Time Performance rates

were better than those of Diamond or Veolia, that its Accident Frequency Rate was average, and that its past problems with driver misconduct, including alleged sexual offenses by Challenger drivers, had been satisfactorily rectified by Fall 2012, when the TET evaluated the proposals.

It has "been repeatedly held that it is proper for evaluators to use their personal knowledge of an offeror's performance of a contract with an agency" when scoring proposals. *Seattle Sec. Servs. v. United States*, 45 Fed. Cl. 560, 568 (2000); *see also Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 842 n.54 (1999) (finding that evaluators "correctly incorporated their personal knowledge" of the past performance on contracts of proposed key personnel in their evaluation of proposals). By 2012, Challenger had been providing MetroAccess service for over a decade. The TET members were thus familiar with Challenger's prior performance record, and that familiarity was reflected in their evaluations. Their assessments included:

- "[Challenger's accident frequency rate] has frequently been the worst in the service, indicating poor training. Operators are ill prepared. Credibility becomes questionable when proposer cites good safety performance." AR 001437.

- "Claim that Challenger adapts quickly and without disruption is not true. Proposer actively resists cooperating with WMATA during times of operational changes." AR 001437.

- "As an incumbent, Challenger should understand that WMATA has an intimate understanding of its past performance under its current contract. Given the difficulties WMATA has had with Challenger management and staff, including some very serious complaints against operators, it is very disturbing to find no discussion of these issues and/or how Challenger would address them in a new contract anywhere in the proposal. Other known problem areas: English proficiency of operators; accident frequency rates highest among all current providers; [On-Time Performance], productivity and complaint rates that do not match what was submitted in the proposal." AR 001439.

- "Prior experience not up to WMATA standards. WMATA staff has had history of struggling to get this proposer to comply with requirements and perform work satisfactorily." AR 001440.

- "Extremely poor history of past performance on current contract, covering all aspects of service, e.g. driver behavior, attainment of performance measures, management practices, adherence to MetroAccess policy and procedure etc." AR 001441.

Challenger argues that in the 11 months immediately preceding the TET's evaluation, its performance history in terms of On-Time Performance and Accident Frequency Rate was comparable to, or better than, that of other offerors. It further asserts that although Challenger had the highest number of incidents of sexual offenses by drivers among MetroAccess service providers, it addressed this issue and had no new instances of such misconduct in 2011 or 2012.

Challenger, however, has not carried its burden to show that, when analyzing Challenger's past performance, the evaluators exercised their broad discretion in an arbitrary and capricious manner. It was rational for the evaluators to base their assessments on the entirety of Challenger's service to WMATA, rather than just the prior 11 months. From 2009 through 2011, for example, Challenger received multiple Notices of Default and other written complaints for various deficiencies, including failing to report accidents immediately, having a high accident frequency rate, failing to maintain their vehicles in proper operating condition, and having drivers committing sexual assaults. Although Challenger may have, like a professional athlete, sought to improve its performance in the final year of its contract in order to position itself more favorably for the next contract, WMATA need not blind itself to history by limiting its evaluation to how Challenger behaved during the "contract year." It was also rational for the evaluators to consider in their past performance analysis Challenger's lack of cooperation, a critique that Challenger has not rebutted. And it was rational for the TET to conclude that Challenger's problems with allegations of sexual assault by drivers remained relevant when letters from MV Transportation, which had subcontracted with Challenger to provide MetroAccess service under MV's WMATA contract, reveal that MV kept Challenger on

probation for these incidents until December 31, 2012, after the TET had completed its evaluation.

For the reasons stated above, the Court finds that WMATA had a rational basis to conclude that Challenger's proposal was deficient in most if not all of the seven identified areas. Thus, the Court concludes that WMATA did not act in an arbitrary and capricious manner by giving Challenger low scores, declining to ask Challenger clarifying questions and to place Challenger in the competitive range, and ultimately declining to award a MetroAccess contract to Challenger.

## F.    Prejudice

To succeed on its contract award protest, Challenger must show not only that WMATA acted in an arbitrary and capricious manner or contrary to law, but also that these violations caused it significant prejudice. *Bannum, Inc.*, 404 F.3d at 1351, 1353. To establish significant prejudice, an offeror must "show that there was a substantial chance it would have received the contract award but for" the alleged errors in the procurement process. *Id.* at 1358; s*ee also Monument Realty II*, 540 F. Supp. 2d at 77 (applying *Bannum*'s definition of prejudice to a disappointed offeror's challenge to a WMATA contract award). Challenger has argued that multiple errors occurred during this procurement. However, even assuming that WMATA's actions were contrary to law, Challenger's claim would still fail because it did not carry its burden to show that it was substantially prejudiced.

Challenger alleged that Thomas Downs violated the WMATA Compact and Board Code of Ethics by simultaneously sitting on WMATA's Board and maintaining his financial interest in Veolia, a MetroAccess contract awardee. The Court determined that Downs did not violate the WMATA Compact and complied with his duties under the Code of Ethics. Even assuming that

his conflict of interest was unlawful and incurable through recusal, his actions did not prevent Challenger from obtaining a contract award. There is no evidence demonstrating that Veolia actually received an unfair advantage in the procurement process. Downs followed the formal recusal procedure and did not participate in any discussions relating to the MetroAccess procurement. Indeed, neither Downs nor the WMATA Board as a whole had the authority to award the MetroAccess contract—that power belonged only to the Chief Procurement Officer. CPO Obora testified in her deposition that although she was aware before the award that Downs had an affiliation with Veolia, she did not know that he had a financial interest in that company, and that even if she had, such knowledge would have had no effect on her decisions. She also never told the TET members about Downs's affiliation with Veolia. Challenger has identified no evidence showing that Veolia was favored by WMATA because of its connection with Downs, or that Veolia received confidential information about the MetroAccess procurement from Downs.

Challenger has also failed to show that the other alleged errors—that the clarification questions constituted improper discussions, and that WMATA's rejection of Challenger's proposal was arbitrary and capricious—resulted in substantial prejudice. The TET Memorandum reveals that the TET assigned Challenger's proposal average scores of 2.0 or below, on a 10-point scale, for each of the three categories set out in the RFP. Challenger's weighted score of 1.9 fell well below the score of 5.0, which the RFP set as the bar for further consideration, and reflected the TET's judgment that the proposal failed to meet an acceptable evaluation standard, its deficiency was uncorrectable, it demonstrated a lack of understanding of WMATA's requirements, or it contained omissions in major areas. Significantly, Challenger's proposal received poor marks not only in isolation, but also in comparison to other proposals. The TET

ranked Challenger tenth out of 11 offerors. Challenger scored lower than three unsuccessful offerors—TransCare, Ready Ride, and Premier—that similarly did not receive any clarification questions. The Court is not convinced by Challenger's assertion at the hearing that, in actuality, it was competing with only Veolia and MV Transportation for a contract because Challenger was one of only three offerors seeking the 50 percent service level contract. There has been no evidence that the TET considered offered service levels when making its technical evaluations, or that Challenger could possibly have remained in contention, despite a failing technical evaluation, simply because it sought a particular contract.

Indeed, as discussed above, even in comparison to the *original* proposals submitted by the eventual contract awardees, Challenger's proposal was deficient in numerous ways, thus demonstrating that the lack of clarification questions sent to Challenger was appropriate and did not materially prejudice its offer. *See supra* part I.E. There is no indication that even if Challenger had received clarification questions, it would have been able to increase its extremely low technical score so much that it would have moved into the competitive range and eventually received a contract award. Thus, Challenger has not shown that absent any alleged errors by WMATA, there was a substantial chance that it would have jumped ahead of the seven other disappointed offerors originally rated higher than Challenger and received the MetroAccess contract. *See Bannum, Inc.*, 404 F.3d at 1358. Where Challenger has failed to show substantial prejudice, its contract award protest must be denied.

## II. PARP

In the cross motions for summary judgment on the PARP claims, the parties disagree on whether WMATA complied with the PARP requirements for releasing documents relating to the MetroAccess procurement. PARP requires WMATA to make its official records "available to

the public for inspection and copying to the greatest extent possible," unless those records fall into one of nine exemption categories. PARP §§ 1.0, 6.1. These exemptions are analogous to those found in the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b) (2012). PARP specifically states that these exemptions should be applied consistently with FOIA's terms and federal practice regarding FOIA. PARP § 1.0.

Challenger appeals from the decision of the WMATA Appeal Panel, which this Court reviews *de novo*. PARP § 9.3.3. As in FOIA actions, WMATA bears the burden of demonstrating that the withheld documents were lawfully exempted from disclosure. *Id.*; *see Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350–51 (D.C. Cir. 1983); *Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 252 (D.D.C. 2005).

At issue are the following documents:

- The TET Memorandum;

- The TET's individual evaluation sheets;

- WMATA's unredacted Award Memorandum, setting out the full contract award amounts for both the base and option years;

- First Transit's price proposal;

- The responses of Veolia, First Transit, and Diamond to the November 2012 clarification questions; and

- The unsuccessful price and technical proposals from the other offerors.

WMATA withheld some of these documents based on the deliberative process privilege, others based on the commercial information exemption.

## A.    Deliberative Process Privilege

PARP § 6.1.5 protects from disclosure "intra-agency and inter-agency . . . memoranda or letters which would not be made available by law to a party in litigation with WMATA." *See*

*also* 5 U.S.C. § 552(b)(5) (describing the FOIA equivalent). This provision empowers WMATA to withhold documents subject to the common law deliberative process privilege. *See Wolfe v. Dep't of Health and Human Servs.*, 839 F.2d 768, 773 (D.C. Cir. 1988).

The deliberative process privilege "allows the government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)). The privilege "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). To be subject to the deliberative process privilege, a document must meet two requirements: (1) it must be predecisional; and (2) it must be deliberative. *In re Sealed Case*, 121 F.3d at 737.

To be predecisional, a document must be one that "precedes, in temporal sequence, the 'decision' to which it relates." *Hinckley v. United States*, 140 F.3d 277, 284 (D.C. Cir. 1998) (quoting *Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987)). Predecisional documents are "'prepared in order to assist an agency decisionmaker in arriving at [a] decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975)). To be deliberative, the document must "reflect[] the give-and-take of the consultative process" used by the agency. *Coastal States*, 617 F.2d at 866. Recommendations, draft documents, proposals, suggestions, and other documents

containing the personal views of the writer rather than the policy of the agency are generally considered deliberative. *Id.*

Even if these two requirements are met, the privilege may be lost if the government agency expressly chooses "to adopt or incorporate by reference" protected material into a document that constitutes final agency action. *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975); *see Coastal States*, 617 F.2d at 866 ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."). This rule applies because "in such a circumstance, the document loses its predecisional and deliberative character." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005).

Citing the deliberative process privilege, WMATA withheld the TET Memorandum, the TET members' individual technical evaluation forms, and the Award Memorandum from its document releases. During the course of this litigation, however, WMATA attached the TET Memorandum and Award Memorandum, the latter with redactions, to its memorandum of law in opposition to Challenger's first motion for summary judgment. *See* ECF Nos. 47-1 & 47-2. These documents were produced as publicly available exhibits, without the benefit of a protective order. Their release to Challenger thus renders the PARP claims regarding them moot, except as to the Award Memorandum's redacted portions. *See Yonemoto v. Dep't of Veteran Affairs*, 686 F.3d 681, 689 (9th Cir. 2012); *Papa v. United States*, 281 F.3d 1004, 1013 (9th Cir. 2002) (finding that "the production of all nonexempt material, 'however belatedly,' moots FOIA claims"). As for those redacted portions, according to WMATA they were withheld as confidential commercial information and are therefore addressed below in the discussion of other documents withheld under the same exemption. *See infra* part II.B.

That leaves the TET members' individual technical evaluation sheets. Courts have routinely held that internal evaluations made during the government procurement process are privileged, provided that they are made before the final award determination and by persons who lack the authority to award the contract. *See, e.g.*, *Brownstein Zeidman & Schomer v. Dep't of Air Force*, 781 F. Supp. 31, 36 (D.D.C. 1991) (finding that "predecisional evaluations" of offers based on the products' test performance were protected by the deliberative process privilege and the relevant FOIA exemption); *SMS Data Prods. Grp., Inc. v. U.S. Dep't of Air Force*, No. 88-0481-LFO, 1989 WL 201031, at *1 (D.D.C. Mar. 31, 1989) (holding that when a disappointed offeror sought release through FOIA of technical scoring records for its proposal, the records were "properly withheld" based on the deliberative process privilege); *Prof'l Review Org. v. Dep't of Health and Human Servs.*, 607 F. Supp. 423, 426–27 (D.D.C. 1985) (holding that score sheets, evaluations, opinions, and recommendations of members of a panel reviewing contract proposals were protected from FOIA disclosure based on the deliberative process privilege); *see also Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 313 (S.D.N.Y. 2012) (holding that "worksheets and initial score sheets" completed by reviewers analyzing applications for a public grant program were protected by the deliberative process privilege); *Dumont v. U.S. Dep't of Air Force*, No. 5:13-cv-73, 2014 WL 12543866, at *7 (D. Vt. Mar. 5, 2014) (holding that score sheets completed by evaluators analyzing potential military base locations were protected from FOIA disclosure by the deliberative process privilege and the relevant exemption).

Those requirements are met here. The TET completed the score sheets from November 2012 to January 2013, approximately two to three months before the contract was awarded. The sheets reflect their authors' opinions, through both written comments and numerical scores,

about the quality of the technical proposals submitted to them. Because only the Source Selection Authority—here, the Chief Procurement Officer—could make the source selection decision, the TET had no authority to determine which offerors would receive contract awards; they simply submitted their analyses to the Chief Procurement Officer and the Contract Administrator. The evaluation sheets were thus both predecisional and deliberative and are protected from PARP disclosure by the deliberative process privilege. *See* PARP § 6.1.5.

Challenger nevertheless argues that WMATA has waived this privilege by releasing the TET Memorandum and Award Memorandum, both of which reference aspects of the individual evaluation sheets. These memoranda, Challenger argues, adopt the evaluation sheets as a final agency determination, which renders them subject to disclosure. *See Coastal States*, 617 F.2d at 866. Relatedly, Challenger asserts that, under *New York Times Co. v. U.S. Department of Justice*, 756 F.3d 100, 115–16 (2d Cir. 2014), the deliberative process privilege is waived when the government references privileged information in a public document.

The Court finds no waiver. First, the release of the Award Memorandum and the TET Memorandum do not effect a broad waiver of the privilege because the deliberative process privilege is not subject to such a subject matter waiver. *See In re Sealed Case*, 121 F.3d at 741; *see also Murray Energy Corp. v. McCarthy*, 5:14-cv-39, 2016 WL 6902359, at *5–6 (N.D. W.Va. July 20, 2017) (collecting cases).

Second, the TET Memorandum was not a final agency action. The TET Memorandum summarized the TET's findings for CPO Obora and the contract administrator. The TET did not make a final determination about any of the offerors, even those whom the TET believed were so technically deficient that they should not receive clarification questions. Rather, the TET "recommended" which offerors should receive further consideration, and which should not.

AR 001432. CPO Obora then used the TET's recommendation first to form the procurement's competitive range, and then ultimately as one factor out of several to decide which offerors would receive contract awards. Indeed, offerors were not dismissed from consideration until CPO Obora notified them herself on March 1, 2013, several months after the TET Memorandum was submitted. As the TET Memorandum was completed before the final award determination was made and by persons who lacked the authority to make a contract award, it was an intra-agency recommendation protected by the deliberative process privilege and by no means adopted the individual evaluation sheets as a final agency determination.

Third, the Award Memorandum did not adopt the technical evaluation sheets as part of a final agency decision. The Award Memorandum was drafted with two sections. The first, under Contract Administrator Karen McSween's signature, outlines the many factors reviewed by WMATA in the course of this procurement, which included, among others, the TET's technical scoring. At the end of this section, McSween states: "Based upon the above, it is determined that the proposals from Diamond, First Transit and Veolia offered the best value to the authority. Therefore, award [is] recommended to Diamond, First Transit and Veolia." AR 001509. Following McSween's signature block, the Award Memorandum contains a second section, entitled "Determination." This section, signed by CPO Obora, formally awards the contracts. Where only CPO Obora had the legal authority to award the contracts, only the final section, under Obora's signature, is the final agency determination. This section did not describe the technical evaluation forms and thus could not be deemed to have adopted them as the final agency decision.

Fourth, even assuming that the Award Memorandum in its entirety could be construed as a final agency action, it still did not adopt the TET Memorandum, much less the TET technical

evaluation sheets, as the final agency determination. Again, the TET did not choose which proposals would or would not receive the contract awards. Rather, it assigned scores to proposals and summarized their strengths and weaknesses. The technical evaluation sheets did even less, providing only the individual views of one TET member regarding a specific proposal. Although the first section of the Award Memorandum summarized the TET's technical recommendations and referenced some, but not all, of the numerical scores and comments contained in the TET Memorandum, the Award Memorandum did not simply adopt the TET's analysis. Rather, it also referenced and discussed the determination of the competitive range, the results of discussions with offerors in that range, and the receipt of best-and-final offers. The Award Memorandum then analyzed the proposals from the standpoint of cost evaluation, a best value determination, price reasonableness, offeror responsiveness, offeror responsibility, and compliance with WMATA's Small Business and Local Preference Goal. Only after all these factors were weighed did WMATA choose contract awardees and formally reject the other proposals. In light of this multi-faceted process, WMATA's mere "'use' of pre-decisional, advisory materials," like the TET Memorandum and the technical evaluation sheets, "does not amount to adoption of those materials" as a final agency action. *United States v. Philip Morris USA, Inc.*, 218 F.R.D. 312, 318 (D.D.C. 2003) (rejecting the position that predecisional documents are subject to disclosure when there is "express use" by an agency of a recommendation or where the deliberations "reflect" final agency decisions). "[A] requirement that a challenged document not resemble or relate to a final agency decision or policy would essentially swallow the deliberative process privilege." *Id.* at 319.

Challenger's reliance on *New York Times* is similarly unpersuasive. *New York Times* involved a FOIA request for a Department of Justice, Office of Legal Counsel Memorandum (the

"OLC Memorandum") analyzing the lawfulness of targeted killings of U.S. citizens abroad. *New York Times*, 756 F.3d at 103. Senior government officials had made several public statements specifically referencing the OLC Memorandum's legal analysis and their reliance upon it, and a Department of Justice White Paper, which "virtually parallels the OLC–DOD Memorandum in its analysis of the lawfulness of targeted killings," was leaked to the press, triggering its official disclosure. *Id*. at 110–11, 116. The United States Court of Appeals for the Second Circuit found these facts sufficient to waive the attorney-client privilege and the deliberative process privilege, but only as to the OLC Memorandum's legal analysis, not to other portions of the document or previous, related OLC documents. *Id*. at 116–17. Important to that conclusion was not only the prior release of the legal arguments via the White Paper, but also the government's public adoption of the OLC Memorandum's legal analysis as the justification for its actions, because once the Government has "publicly assert[ed] that OLC advice 'establishes the legal boundaries within which we can operate'; it 'cannot invoke that relied-upon authority and then shield it from public view.'" *Id*. at 116–17 (quoting *Brennan Ctr. for Justice v. U.S. Dep't of Justice*, 697 F.3d 184, 207–08 (2d Cir. 2012)). Thus, the legal analysis of the OLC Memorandum was subject to release because (1) it had already been publicly disclosed through the White Paper; (2) the protections of the attorney-client privilege had been waived by that disclosure; and (3) the Government had repeatedly adopted that analysis as part of its policy on targeted killings.

Here, in contrast, the released Award Memorandum referenced the TET's evaluation and described some of its findings, but it did not disclose the full content of either the TET Memorandum or the individual TET members' technical evaluation sheets. The released TET Memorandum, in turn, listed the offerors' averaged numerical scores and summarized the evaluators' written comments, but it did not release the full contents of their individual

evaluations. Therefore, making public the individual technical evaluation sheets would release information never seen before, including the full scoring data, dozens of written comments never incorporated into the Memoranda, and the identities of the TET evaluators. In addition, none of the evaluations constituted legal advice subject to a waiver of the attorney-client privilege. Finally, as discussed above, the Award Memorandum, the only document that could be construed as a final agency decision, did not merely adopt the findings of the TET Memorandum or the technical evaluation sheets as its decision. Accordingly, releasing the Award and TET Memoranda did not waive the deliberative process privilege protecting the technical evaluation sheets. Challenger's claim that the technical evaluation sheets must be disclosed therefore fails.

### B.    Confidential Commercial Information

WMATA asserts that its withholding of the remaining requested documents was justified under PARP § 6.1.4, which exempts from disclosure "trade secrets and commercial or financial information" that is "privileged or confidential." Under this exemption, information is "confidential" "if its disclosure is likely to (1) 'impair the Government's ability to obtain necessary information in the future,' or (2) 'cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Acumenics Research & Tech. v. U.S. Dep't of Justice*, 843 F.2d 800, 807 (4th Cir. 1988) (quoting *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 766 (D.C. Cir. 1974)). Where, as here, the documents are withheld under the test's second prong, the government bears the burden to demonstrate "'the likelihood of substantial competitive harm' [that] would result from disclosure." *Wickwire Gavin, P.C. v. U.S. Postal Serv.*, 356 F.3d 588, 591 n.5 (4th Cir. 2004) (quoting *Hercules, Inc. v. Marsh*, 839 F.2d 1027, 1030 (4th Cir. 1988)). Pursuant to this exemption, WMATA withheld First Transit's price proposal, other than the bottom-line base-contract price; the option-year pricing redacted from

the Award Memorandum; offerors' responses to the November 2012 clarification questions; and the unsuccessful price and technical proposals from Challenger's other competitors in this procurement.

First Transit's full pricing proposal was properly withheld as confidential commercial information. First Transit notified WMATA that this information is "proprietary and, if disclosed, would cause substantial injury to the competitive position of First Transit." PARP Joint Record ("PARP JR") 377. WMATA concluded that the sought-after pricing proposal contains detailed information about First Transit's business that, if revealed, could allow Challenger to reverse-engineer First Transit's pricing strategies and underbid it in the future. In particular, WMATA considered the facts that First Transit and Challenger are direct competitors, including for the new MetroAccess contracts currently the subject of a solicitation, and that the limited number of variables that determine unit pricing for MetroAccess services may allow other companies to deduce First Transit's pricing strategy for future proposals. Such information is routinely exempted from disclosure when its release could cause competitive harm. *See, e.g.*, *Canadian Commercial Corp. v. Dep't of Air Force*, 514 F.3d 37, 42–43 (D.C. Cir. 2008) (holding that line-item pricing information was exempt from disclosure); *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 306–07 (D.C. Cir. 1999) (same); *Citizens for Responsibility & Ethics in Washington v. Dep't of Justice*, 160 F. Supp. 3d 226, 238–39 (D.D.C. 2016) (holding that pricing sheets submitted with a contract proposal were exempt from disclosure because release would cause serious competitive harm); *Essex Electro Eng'rs, Inc. v. U.S. Sec'y of Army*, 686 F. Supp. 2d 91, 94–95 (D.D.C. 2010) (holding that a government contractor's unit-price information was exempt from disclosure). Challenger therefore will not be permitted to obtain this information.

Likewise, the redaction of option-year pricing from the Award Memorandum was also justified. Courts have held that a contract awardee's option-year pricing can be appropriately withheld because disclosure can cause substantial competitive harm. *See, e.g.*, *McDonnell Douglas Corp. v. U.S. Dep't of Air Force*, 375 F.3d 1182, 1188 (D.C. Cir. 2004). For example, releasing option-year pricing increases the probability that competitors will underbid the awardee in the event that the agency chooses not to exercise the option and instead re-competes the contract. *Id.* at 1188–89 (finding that disclosure of option-year pricing was improper, even though factors other than price would also be considered); *see also Canadian Commercial Corp.*, 514 F.3d at 41–43 (finding that release of pricing information could cause substantial competitive harm by enabling rivals to undercut a company's prices when bidding for option-year work). Here, at the time that WMATA made its determination to redact the option-year pricing information, it did not know whether it would exercise the option or not. As it turns out, WMATA did choose not to exercise the option and is presently conducting a negotiated procurement for the next MetroAccess contract, with service to begin in July 2018. Under these circumstances, had WMATA disclosed First Transit's option-year pricing, it likely would have given Challenger and other offerors an unfair advantage in the present procurement covering same time period applicable to the option. The redactions were therefore appropriate under PARP.

Next Challenger seeks the responses of Veolia, First Transit, and Diamond to WMATA's November 2012 clarification questions. WMATA's only argument for non-disclosure is that Challenger failed to exhaust administrative remedies by not requesting them during the administrative appeal. In its PARP request, Challenger asked for "[a]ll records constituting technical or price proposals—including any supplements, revisions, clarifications or

addendum—submitted by entities other than Challenger." PARP JSF ¶ 2. In its appeal letter, Challenger then asked for "all documents requested by [the original] PARP Request." PARP JR 2045. Challenger therefore requested these documents in its appeal, even though the Appeal Panel chose not to address this issue in its decision. The Court finds no failure to exhaust administrative remedies.

Upon consideration of the merits, the Court finds no basis for WMATA to withhold the responses to the clarification questions. WMATA has already released the questions themselves and the technical proposals they address. It has not provided any explanation regarding why the offerors' responses, which are fairly construed as supplements to the technical proposals, merit greater protection than the technical proposals themselves. Indeed, at the hearing, counsel for WMATA acknowledged that it had no argument on the merits for withholding these documents. WMATA therefore must release the information, subject to the same redactions already applied to the technical proposals.

Finally, Challenger had sought the price and technical proposals from the other unsuccessful offerors. By statute, such proposals may not be disclosed under FOIA. 41 U.S.C. § 4702(b) (2012) ("A proposal in the possession or control of an executive agency may not be made available to any person under [FOIA]."). Apparently in recognition of this limitation, Challenger has now conceded that it is not entitled to these documents.

## CONCLUSION

For the foregoing reasons, Challenger's Motion for Summary Judgment in the contract award protest is DENIED, and WMATA's Cross Motion for Summary Judgment in the contract award protest is GRANTED. Challenger's Motion for Summary Judgment on the PARP claims is GRANTED IN PART and DENIED IN PART, and WMATA's Cross Motion for Summary

Judgment on the PARP claims is GRANTED IN PART and DENIED IN PART. Challenger's PARP Motion is granted to the extent that WMATA will be required to release, pursuant to the PARP, the responses to clarification questions submitted by Veolia, First Transit, and Diamond. It is denied in all other respects. A separate Order shall issue.

Date:  November 28, 2017

THEODORE D. CHUANG
United States District Judge